1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11  ISAAC MACIAS CORONADO,                )     1:04-CV-06012 AWI SMS HC
                                          )
12          Petitioner,                   )
                                          )     FINDINGS AND RECOMMENDATION
13      v.                                )     REGARDING PETITION FOR WRIT OF
                                          )     HABEAS CORPUS
14                                        )
    M. YARBOROUGH, Warden,                )
15                                        )
            Respondent.                   )
16  _____ )

17
18      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
19  pursuant to 28 U.S.C. § 2254.

20                              **BACKGROUND**

21      Petitioner is currently in the custody of the California Department of Corrections pursuant to
22  a judgment of the Superior Court of California, County of Fresno, following his conviction by jury
    trial on August 14, 2000, of one count of first degree murder with special circumstance (Cal. Penal
23  Code §§ 187(a), 190.2(a)(17)), one count of kidnapping (Cal. Penal Code § 207(a)), and one count of
24  carjacking (Cal. Penal Code § 215(a)). See Lodged Doc. No. 1.[1] On September 12, 2000, Petitioner
25  was sentenced to serve a term of life without the possibility of parole plus nineteen years. Id.
26

27      [1]"Lodged Doc." refers to the documents lodged by Respondent with his response.
28

1    Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

2  (hereinafter "Fifth DCA"). On October 1, 2002, the Fifth DCA affirmed the judgment. <u>See</u> Lodged

3  Doc. No. 4. On November 1, 2002, Petitioner filed a petition for review in the California Supreme

4  Court. <u>See</u> Lodged Doc. No. 5. The petition was summarily denied on December 11, 2002. <u>See</u>

5  Lodged Doc. No. 6.

6    On February 24, 2003, Petitioner filed a petition for writ of habeas corpus in the California

7  Supreme Court. <u>See</u> Lodged Doc. No. 7. The petition was denied on October 1, 2003. <u>See</u> Lodged

8  Doc. No. 8.

9    Petitioner next filed a petition for writ of habeas corpus in the Fifth DCA on March 11, 2003.

10  <u>See</u> Lodged Doc. No. 9. The Fifth DCA denied the petition on March 13, 2003. <u>See</u> Lodged Doc.

11  No. 10.

12    Petitioner filed a petition for writ of habeas corpus again in the Fifth DCA on June 24, 2003.

13  <u>See</u> Lodged Doc. No. 11. The petition was summarily denied on July 3, 2003. <u>See</u> Lodged Doc. No.

14  12.

15    On July 21, 2003, Petitioner filed a petition for writ of habeas corpus in the California

16  Supreme Court. <u>See</u> Lodged Doc. No. 13. The petition was denied on April 14, 2004. <u>See</u> Lodged

17  Doc. No. 14.

18    On July 26, 2004, Petitioner filed the instant petition in this Court. The petition presents the

19  following grounds for relief: 1) Petitioner claims the trial court committed reversible error when it

20  decided to replace one of the sitting jurors during the course of the trial; 2) Petitioner claims there

21  was insufficient evidence to support the specific finding of murder/kidnapping; 3) Petitioner raises

22  multiple claims of ineffective assistance of trial and appellate counsel; 4) Petitioner claims he was

23  denied his right to a speedy trial; and 5) Petitioner contends the trial court abused its discretion in

24  failing to instruct on the lesser-included offenses of murder. On June 2, 2005, Respondent filed an

25  answer to the petition. He filed a supplemental points and authorities to the answer on June 28, 2005.

26  Petitioner filed a traverse on October 11, 2005.

27

28

1

**FACTUAL BACKGROUND**[2]

2          Victim Leticia Coronado suffered years of abuse, physical and psychological, from her

3   husband, Petitioner, who was extremely jealous and controlling. Although Petitioner did not strike

4   Leticia in front of their three children, he would order her to go to the garage with him; when they

5   returned, Leticia would have fresh bruises.

6          Petitioner's jealousy erupted again on February 8, 1999, at their home in Watsonville.

7   Accusing her of having a sexual affair, Petitioner inspected Leticia's body for evidence of sexual

8   activity, then took her out for a drive. As they drove, Petitioner ordered Leticia to remove her

9   clothes. Petitioner finally parked in a remote location in "the woods." There, after inspecting her

10  body, Petitioner beat her, choked her, and pulled hair from her head and her pubic area. The bruising

11  was so apparent when Leticia went to work the next day that her supervisor summoned the sheriff.

12  Although initially hesitant to talk, Leticia eventually spoke with the officer, saying that she was

13  "tired of living the way she was." Petitioner was arrested and spent three days in jail. On release, he

14  found that Leticia had moved out, taking the children with her.

15         Leticia and Petitioner decided to try to work things out, and she and the children moved back

16  home on March 1, 1999. However, Leticia made it clear that their relationship could not continue as

17  before, that things had to change. For example, she would no longer go to a relative's house for her

18  lunch hour as Petitioner had formerly required her to do. As a result of the earlier incident, Petitioner

19  was on probation and required to attend counseling.

20         On the evening of March 21, 1999, Petitioner and Leticia began to argue. As the argument

21  escalated, Leticia told Petitioner that she was going to leave and reminded him that striking her

22  would result in his return to jail. Petitioner retorted, "You're not going to take my kids away," and

23  demanded her keys, which she surrendered. Neither of the two went to work on the 22nd, nor was

24  either home when their son returned from school that afternoon. After reading some letters Petitioner

25  had left regarding what the family was to do should anything happen to Petitioner or Leticia, the son

26  reported the couple missing. That evening, Petitioner hijacked a car in Fresno County and fled,

27  _____

28         [2]The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of October 1, 2002, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). See Lodged Doc. No. 4 at 2-5.

eventually, reaching Mexico.

The morning of the 23rd, police found Leticia's body in the trunk of Petitioner's car, which had been abandoned in an "extremely isolated area" in western Fresno County. The windshield had a hole caused by a gunshot. Leticia was partially clothed in pajama bottoms and had a pair of handcuffs on her left wrist. Impressions in the dirt by the passenger side of the car indicated that her body had been dragged to the trunk. Autopsy revealed that Leticia had died of "smothering and multiple blunt impact injuries to the head." The coroner described the beating as "severe." The absence of blood in the trunk indicated that the victim was dead, or almost so, when placed there.

In the car, police found a tape recorder. On the tape, Petitioner addresses Leticia as they drive, describing how his situation has become intolerable since the arrest:

> [A]ll you do is argue with me . . . all you do is to make me, make me cry . . . cause you know that [I] can't hit you . . . you know that I can't talk back to you, you know that anything I do . . . 'I'm gonna call [Leticia's brother] to pick me up,' or you're gonna send me to jail. I'm tired of the threats. I warned you, I warned you . . . that if you made those threats that was gonna do something bad. I warned you . . . I said you're gonna be sorry if you keep on doing that . . . .

As Leticia begs for her life, Petitioner repeatedly states that he is going to kill her. "I've kidnapped my wife . . . and I am going to kill her." "You fucked up. I hit you in the head, I'm going to jail, I shot a gun, I have a gun. I'm . . . supposed to have a gun. I kidnapped you, now they can say I kidnapped you." "How does it feel to know you're gonna die? I want you to tell me." "Too late girl! You're gonna die!" When Leticia apologizes, Petitioner states, "You would never talk to me like this if I didn't have a gun in my hand." At one point, Petitioner acknowledges that he has just hit Leticia.

Petitioner also addresses his children and laments that he will never see them again, "[b]ut, I have to do what I have to do! Cause this woman was treating me terrible." Petitioner also provides information about his finances, asks relatives to look after his children, and names staff in the police and probation departments and child support services who interfered in his life post-arrest and thus are also to blame for what he is doing.

**Defense**

Petitioner testified that the night of the 21st, he and Leticia left the house at approximately 10:30 or 11:00 p.m. to take a drive and talk. In the car, Leticia grabbed a gun that Petitioner had,

1  causing the gun to discharge and put a bullet through the windshield. Petitioner acknowledged that

2  he recorded their conversation and that the voices on the tape were his and Leticia's. However, he

3  testified that he could not explain why he said the things he did that night. "I started going crazy."

4  "Something went very wrong and I can't understand it still."

5       Petitioner testified that he could not remember much of the incident, but that at some point he

6  told Leticia to handcuff herself, which she did. "I think she knew I wasn't right." Petitioner said that

7  he had a moment of clarity when he realized the car needed gas. Afraid that Leticia might try to get

8  help at the gas station, he told her to get in the trunk, which again she did willingly. She had no

9  bruises at this time. After that, his memory was again vague. However, he knew that Leticia never

10  got out of the trunk after that. When Petitioner abandoned the car, Leticia was still alive and

11  screaming to him as he left, "Isaac. Isaac, don't leave me here."

12       Petitioner acknowledged sending letters to family around the time of the murder, including

13  one in which he stated that he had proof that Leticia had had an affair and that "I must do what I

14  must do. See that my kids get guidance and hope." However, he said that he never intended to kill

15  Leticia. Petitioner acknowledged that there had been abuse in the marriage, but not as much or as

16  severe as the prosecution made it seem. And when they fought, it would be Leticia who would hit

17  first. "She didn't have no black eyes or bruises. What it was is she had age spots."

18  **DISCUSSION**

19  **I.  Jurisdiction**

20       Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

21  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

22  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

23  375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

24  Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court,

25  which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

26  the Court has jurisdiction over the action.

27       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

28  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

1  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

2  F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

3  *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

4  (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

5  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

6  **II.  Legal Standard of Review**

7       This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

8  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

9  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10      The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

11  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

12  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

13  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

14  application of, clearly established Federal law, as determined by the Supreme Court of the United

15  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

16  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

17  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

18      As a threshold matter, this Court must "first decide what constitutes 'clearly established

19  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

20  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

21  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

22  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

23  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

24  the Supreme Court at the time the state court renders its decision." Id.

25      Finally, this Court must consider whether the state court's decision was "contrary to, or

26  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

27  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

28  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

1   question of law or if the state court decides a case differently than [the] Court has on a set of

2   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

3   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

4   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

5   applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

6        "[A] federal court may not issue the writ simply because the court concludes in its

7   independent judgment that the relevant state court decision applied clearly established federal law

8   erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

9   federal habeas court making the "unreasonable application" inquiry should ask whether the state

10  court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

11       Petitioner has the burden of establishing that the decision of the state court is contrary to or

12  involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

13  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

14  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

15  decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

16  Cir.1999).

17       AEDPA requires that we give considerable deference to state court decisions. The state

18  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

19  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537

20  U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

21  **III.  Review of Petitioner's Claims**

22       **A. Ground One**

23       Petitioner first alleges the trial court committed reversible error when it discharged Juror No.

24  8 during the trial.

25       The factual background of this claim was summarized by the Fifth DCA as follows:

26            Prior to argument, the court called Juror No. 8 into the courtroom outside the
             presence of the other jurors:

27
             'THE COURT: The reason I've had you brought into the courtroom without the other
28           jurors, . . . is that I've been provided some police reports and other documents that

give me some information that you've been the victim of spousal abuse or cohabitant abuse. Individuals involved were Trevor Reed and a Sean Robinson on two separate occasions, and there was another incident less serious. And the concern I have is that during the questioning of the jurors when we first started this case, when requests were asked either of the panel generally or you specifically concerning that issue, you remained silent, didn't say anything. And it seems to me that, in fact, you have been the victim of that type of abuse. I mean, it's a concern, obviously we get to this stage of the proceedings and find out perhaps you were a victim and for some reason didn't say anything.

The juror responded that in the case of Reed, she was not a victim, as she apparently had explained at the time in a letter to the court specifying that "nothing happened here." With regard to Robinson, she said, "I did get hit. Yes, I did." The juror then explained that she had not mentioned these events because "[i]t just wasn't a big thing. It didn't effect me. That's done, over with."

The court also asked the juror about a robbery that occurred while she was working at a market. The juror claimed to be in the back office, unaware of the robbery until afterward. When the court observed that "I thought he came in and actually talked to you and told you not to turn around, not to look at him?" The juror said that she was "still in the office. I forgot about all that."

Concerned about possible bias to either the prosecution or the defense, the court excused the juror. The prosecutor then pointed out that his office had prosecuted Reed for murder "some number of years ago," that the record reflected that Juror No. 8 had been Reed's girlfriend at that time, and that she had also failed to mention this fact despite the prosecutor's specific request that the prospective jurors disclose "whether friends, family, loved ones, have been prosecuted by this office and/or had they followed a murder trial."

Defense counsel objected to the juror's discharge, arguing that she was simply a quiet, and "undemonstrative kind of person," and that she was only once a victim of domestic violence, in the Robinson incident, which she characterized as "not a big deal." The court disagreed:

> I differ somewhat in my evaluation of [Juror No. 8]. I thought she was pretty bright. A little on the quiet side. Didn't share too much. But I thought her answers generally were thoughtful. She thought about her answers. That's pretty dramatic stuff, the things that have happened in her life, and for her not to bring it out to our attention, it's sort of amazing to me. She was a victim of robbery in the last case I mentioned, the store.

The court also disagreed with the juror's characterization of herself as not being a victim in the Reed incident, for which Reed was not only prosecuted, but convicted and sentenced to prison:

> As to Terrel Reed, there's no indication there was physical violence against her, but there was certainly a lot of arguing. In that case Mr. Reed went into her home and displayed a tech nine, some weapon of that nature, and told her to get out of the house. Not to share that, I think, is leaving [out] a lot.

See Lodged Doc. No. 4 at 5-7.

This claim was first presented on direct appeal to the Fifth DCA. On October 1, 2002, the Fifth DCA denied the claim in a reasoned opinion. See Lodged Doc. No. 4. On November 1, 2002,

Petitioner filed a petition for review in the California Supreme Court. See Lodged Doc. No. 5. The petition was summarily denied on December 11, 2002. See Lodged Doc. No. 6. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court analyzed and rejected the claim as follows:

Section 1089, in relevant part, states: 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found unable to perform his duty, . . . the court may order him to be discharged . . . .' 'The decision to discharge a juror rests within the sound discretion of the trial court. The court must make a reasonable inquiry to determine whether the person in question is able to perform the duties of a juror. If the answer is in the negative, the inability to perform those duties must be shown on the record to be a 'demonstrable reality.' 'An abuse of discretion occurs where the court's decision exceeds the bounds of law or reason. However, it is important to note while many courts have considered the matter, few have disturbed a trial court's decision to discharge a juror for good cause.'

A juror's misconduct is good cause which, under the provisions of either section 1089 or 1123, may permit the court to replace him or her with an alternate, . . . .' 'It is well established that '[a] juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct.' 'In determining whether misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'

[Petitioner] contends that nothing showed Juror No. 8 was unable to perform her duties, since she had merely neglected to mention some 'trivial or forgotten incidents' and she had stated that she was certain these incidents would not affect her performance as a juror. [Petitioner's] argument, of course, relies on the juror's credibility. Here, the number of omissions, as well as the extent of the discrepancies between the juror's characterization of events and the facts found by the court, support the conclusion that the juror was not credible in this matter. Having found the juror not credible as to the nature of her experiences, the court was also entitled to find suspect her statements as to the effect those experiences had, or did not have, on her outlook and attitudes. The court was well within its discretion to discharge Juror No. 8.

See Lodged Doc. No. 4 at 7-8 (citations omitted).

Respondent properly argues that this claim fails to present a cognizable federal ground for relief.  The claim is one of state law, and generally, issues of state law are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on

1    federal habeas"). Furthermore, "incorrect" evidentiary rulings are not the basis for federal habeas

2    relief. Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091 (1991). In

3    addition, federal courts are bound by state court rulings on questions of state law. Oxborrow v.

4    Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

5          In any case, the claim is without merit. In light of the juror's concealment of relevant

6    incidents and the discrepancies in her testimony, the trial court's decision to discharge her was

7    entirely reasonable. The rejection of this claim by the state courts was neither contrary to or an

8    unreasonable application of clearly established Federal law, nor an unreasonable determination of the

9    facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

10         **B.  Ground Two**

11         Petitioner next alleges there was insufficient evidence to support the special circumstance

12   finding of murder committed during kidnapping. He claims the evidence proved the act of

13   kidnapping was merely incidental to the act of killing Leticia.

14         Like Ground One, this claim was first raised on direct appeal to the Fifth DCA, which

15   rejected it in a reasoned opinion. See Lodged Docs. No. 2-4. He then raised it to the California

16   Supreme Court by petition for review, but again was denied relief.  By its "silent order" denying

17   review of the Fifth DCA's decision, the California Supreme Court is presumed to have denied the

18   claim presented for the same reasons opined by the Fifth DCA.  Ylst, 501 U.S. at 803.

19         In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson

20   standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979).  See People v. Johnson, 26 Cal.3d

21   557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).  Pursuant to the

22   Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly

23   supported by the record is as follows:

24         "[W]hether, after viewing the evidence in the light most favorable to the
             prosecution, any rational trier of fact could have found the essential elements
25         of the crime beyond a reasonable doubt."

26   Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

27         Sufficiency claims are judged by the elements defined by state law.  Jackson, 443 U.S. at 324

28   n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

1   § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of correctness

2   applies to state appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v.</u>

3   <u>Borg</u>, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

4   state court determinations of legal questions or mixed questions of law and fact, the facts as found by

5   the state court underlying those determinations are entitled to the presumption.  <u>Sumner v. Mata</u>, 455

6   U.S. 539, 597 (1981).

7            In rejecting this claim, the appellate court stated:

8            'A felony-murder special circumstance . . . may be alleged when the murder occurs
         during the commission of the felony, not when the felony occurs during the commission of a
9        murder.' 'Thus, to prove a felony-murder special-circumstance allegation, the prosecution
         must show that the defendant had an independent purpose for the commission of the felony,
10       that is, the commission of the felony was not merely incidental to an intended murder.'
         'Concurrent intent to kill and to commit an independent felony will support a felony-murder
11       special circumstance.'

12            [Petitioner] contends the evidence is insufficient to establish that the kidnapping was
         anything other than a mere incident of the murder itself. To the contrary, he argues, the tape
13       and the letters establish 'clearly and unequivocally' that the sole purpose of the kidnapping
         was to end Leticia's life.

14
             We must therefore determine here whether, viewing the evidence in the light most
15       favorable to the prosecution, any rational trier of fact could have concluded that defendant
         had a purpose for the kidnapping apart from the murder. We conclude the evidence is
16       sufficient to establish that defendant kidnapped Leticia with 'independent, albeit concurrent,
         goals.'

17
             The tape supports the conclusion that [Petitioner] did not kidnap Leticia just to kill
18       her but also first to torment her. It was hardly necessary to drive from Watsonville to Fresno
         County to find a remote location at which to kill Leticia. Rather, the journey suggests that
19       [Petitioner] sought to subject Leticia to prolonged captivity before finally killing her. And his
         statements and actions during the ordeal establish that his purpose then was to inflict
20       retaliatory pain, fear, humiliation, and terror, renewing his control and her subjugation. 'Hey .
         . . just like I was begging you, huh? When I was on my knees . . . to take me back, huh?'
21       'How does it feel to know you're gonna die? I want you to tell me.' 'Do you know how much
         I suffered? No, you have no idea, but you have an idea now.'

22
             As the prosecution argued on closing, [Petitioner] 'was not going to be satisfied with
23       killing this woman. She had to pay and she had to pay dearly with more than her life.'
         Sufficient evidence supports the special circumstance finding.

24
     <u>See</u> Lodged Doc. No. 4 at 8-9.

25
             The appellate court applied the correct standard and did so reasonably. The evidence certainly

26  supported the finding that Petitioner specifically intended to kidnap and torment the victim in

27  addition to killing her. This claim should be rejected.

28

1    **C.  Ground Three**

2          Petitioner raises several claims of ineffective assistance of counsel. He alleges there was a

3    conflict of interest because trial counsel performed activities which served the interest of the district

4    attorney. He asserts counsel failed to investigate the case. He claims counsel failed to prepare

5    because he was on another case at the time. He claims counsel failed talk about the case or the

6    investigation, or keep Petitioner informed of the case. For instance, counsel allegedly failed to

7    inform Petitioner that certain charges were dismissed or that the prosecution would not pursue the

8    death penalty. He further alleges counsel made a deal with the district attorney in order that the

9    district attorney would not pursue the death penalty. He contends counsel failed to request

10   instructions "to maintain different levels of murder as of voluntary second degree murder." See

11   Petition at 8. He claims appellate counsel was ineffective for failing to raise the above allegations on

12   direct appeal.

13         Respondent argues that several of these instances of ineffective assistance were never

14   presented to the California Supreme Court and are therefore unexhausted. In any case, the claims are

15   without merit and will be addressed.

16         The law governing ineffective assistance of counsel claims is clearly established for the

17   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

18   F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance

19   of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687

20   (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that

21   counsel's performance was deficient, requiring a showing that counsel made errors so serious that he

22   or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466

23   U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard

24   of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of

25   reasonable professional judgment considering the circumstances. Id. at 688; United States v.

26   Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is

27   highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the

28   wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21

1   F.3d 1446, 1456 (9th Cir.1994).

2   Second, the petitioner must demonstrate that "there is a reasonable probability that, but for

3   counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.

4   Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial,

5   one whose result is reliable. Id. at 688.  The court must evaluate whether the entire trial was

6   fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78

7   F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

8   A court need not determine whether counsel's performance was deficient before examining

9   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at

10  697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

11  prejudice must necessarily fail. However, there are certain instances which are legally presumed to

12  result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of

13  counsel or where the State has interfered with counsel's assistance. Strickland, 466 U.S. at 692;

14  United States v. Cronic, 466 U.S. 648, 659, and n. 25 (1984).  Ineffective assistance of counsel

15  claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362

16  (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

17  Effective assistance of appellate counsel is also guaranteed by the Due Process Clause of the

18  Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective

19  assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  See, e.g.,

20  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847

21  (9th Cir.1986).  Therefore, as above, a defendant must show that appellate counsel's advice fell

22  below an objective standard of reasonableness and that there is a reasonable probability that, but for

23  counsel's unprofessional errors, defendant would have prevailed on appeal. Miller, 882 F.2d at 1434

24  & n. 9, citing, Strickland, 466 U.S. at 688, 694; Birtle, 792 F.2d at 849.  However, appellate counsel

25  does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. Jones v.

26  Barnes, 463 U.S. 745, 751-54 (1983); Miller, 882 F.2d at 1434 n. 10.  The weeding out of weaker

27  issues is widely recognized as one of the hallmarks of effective appellate advocacy. Miller, 882 F.2d

28  at 1434.  As a result, appellate counsel will frequently remain above an objective standard of

competence and have caused his client no prejudice for the same reason - because he declined to raise a weak issue. Id.

*1.  Conflict of Interest*

Petitioner first alleges defense counsel had a conflict of interest by taking on the role of the district attorney. He claimed in his petition for review that trial counsel told Petitioner he would lose, and he claimed counsel took three weeks off to run the Boston Marathon.

As correctly argued by Respondent, this claim is completely conclusory. James v. Borg, 24 F.3d 20, 29 (9th Cir.1994); Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory allegations made with no reference to the record or any document do not merit habeas relief); Allard v. Nelson, 423 F.2d 1216, 1217 (9th Cir.1970) (Conclusory allegations in a habeas petition fail to state a claim and do not suffice to shift the burden to the state to answer an order to show cause.)  Petitioner does not identify counsel - he had three. Moreover, he fails to show how counsel's actions resulted in any prejudice.

*2. Failure to Investigate*

Petitioner next claims counsel failed to investigate his case. Once again, the claim is totally conclusory and unsupported. To the extent he claims counsel was ineffective for pursuing an insanity defense, as he claimed on direct appeal, his claim is without merit.

There was definitely evidence of mental problems experienced by Petitioner which could have caused a reasonably competent attorney to pursue an insanity defense. Petitioner's former attorney, Barbara O'Neill, advised the trial court that Petitioner was not present on October 7 and 8, 1999, because he had injured himself in an apparent suicide attempt. RT 803, 807-808. She stated to the court, "I would at this time want to declare a doubt under Penal Code Section 1368(a), competence." RT 803. As a result, two doctors were appointed to evaluate Petitioner. RT 904. On November 12, 1999, the court determined Petitioner was competent to go forward with trial. RT 1004.

Petitioner's next appointed attorney, James Lambe, advised the court on March 27, 1999, that he would be pursuing a plea of not guilty by reason of insanity. RT 1301. On August 10, 2000, the sanity phase of the trial commenced. RT 3604. Defense counsel argued to the jury that Petitioner was

suffering from some mental disease or defect. RT 3608. He also told the jury that Petitioner knew the nature and quality of his act. RT 3609. Counsel argued, however, that Petitioner did not recognize right from wrong. RT 3609. In support of his argument, counsel played the tape recording of Petitioner and highlighted instances where he alleged Petitioner did not understand what he was doing was morally wrong. RT 3609-3622.

Dr. Daniel Sherman was called by the prosecution during the sanity hearing. RT 3625. After evaluating Petitioner, Dr. Sherman determined he suffered from a delusional disorder, of the jealous type. RT 3639, 3693-3694. Dr. Avak Hovsepian was also called at the sanity hearing. RT 3698. In his opinion, Petitioner suffered from a "personality disorder not otherwise specified, major depressive disorder, moderate severity, a possible learning disorder." RT 3727.

In light of this record, it cannot be said counsel's performance fell below an objective standard of reasonableness. There was sufficient evidence from which an insanity defense could be raised. Therefore, Petitioner has not shown counsel erred. In addition, he cannot demonstrate prejudice resulting from counsel's decision to pursue an insanity defense. Without having done so, Petitioner would have been left with no defense at all. Accordingly, this claim should be rejected.

### *3.  Failure to Prepare*

Petitioner next argues his trial counsel failed to adequately prepare for trial because he was working on another case.

This claim is also conclusory. Petitioner fails to state what counsel should have done to adequately prepare for the case, or how the preparations he had done were lacking. For this reason, Petitioner does not demonstrate how counsel erred, or how Petitioner suffered prejudice. This claim should also be rejected.

### *4.  Failure to Discuss Case or Keep Petitioner Informed*

Petitioner claims defense counsel failed to discuss the case with him adequately when he visited with him. He further claims counsel failed to explain the investigation or the status of the case. He also claims counsel spent far too little time with Petitioner.  However, review of the record of the Marsden hearings shows trial counsel did in fact explain the investigation and status of the case and the charges against Petitioner, and did spend sufficient time with Petitioner.

On May 4, 1999, the first <u>Marsden</u> hearing was held, wherein Petitioner complained that his then-attorney, Jack Weiss, had only visited with him twice and had only spent approximately 70-75 minutes with him. RT 110, 111. Mr. Weiss responded that his initial visit was an hour and a half, his second visit was over two hours, and third visit was approximately one hour. RT 111-112.  These visits occurred from the time the file was assigned to Mr. Weiss on April 15, 1999, to May 4, 1999, the date of this <u>Marsden</u> hearing.  In addition, counsel stated he had spent a significant amount of time apart from those visits securing evidence such as a tape recording. RT 112. In denying the <u>Marsden</u> motion, the trial court ruled that counsel had devoted, "by the standard of both private and public counsel, a considerable amount of time." RT 115.

On June 11, 1999, a second <u>Marsden</u> hearing was conducted. At this hearing, Petitioner again claimed that Weiss had only spent two hours with him in the past two months, he refused to respond to Petitioner's letters, and he would not accept or return Petitioner's phone calls. RT 305. Weiss responded that, as to the phone calls, the Public Defender's Office has a policy not to accept collect calls. RT 309. In addition, Weiss stated that he was concerned that phone calls were not confidential and therefore could jeopardize the defense if Petitioner communicated sensitive information. RT 309. Weiss also stated he had regularly visited with Petitioner and spent a considerable amount of time with him. RT 309. However, Weiss notified the court that Petitioner could possibly be suffering from mental problems which had caused breakdowns in their communications. RT 310. Weiss complained that Petitioner was not being cooperative in producing information necessary for the defense. RT 310-311. Weiss stated, "I'm in the dark, Your Honor, as to [Petitioner's] side of his story, and yet he wants me to be ready and prepared and able to go forward at the earliest on a preliminary examination." RT 314-315. Weiss attempted to bring in a doctor to assist in communicating with Petitioner, but Petitioner refused to speak with him. RT 311. Weiss stated the relationship between attorney and client had broken down significantly. RT 312-315. In addition, Weiss notified the court that he had just been assigned to a lengthy trial which would cause him to be unavailable to for approximately three to four weeks. RT 321. Because of counsel's future unavailability and the breakdown in the relationship, the court relieved Weiss and appointed a new attorney. RT 322.

On July 16, 1999, a third Marsden hearing was held. RT 409. In this hearing, Petitioner complained that his new attorney, James Lambe, only spent 25-30 minutes with him on one occasion and five minutes on another occasion. RT 410. Because Petitioner felt Lambe had been rude to him, he refused to talk to him when he visited on the third occasion. RT 411. Petitioner complained that Lambe was purposely delaying his trial and denying his right to a speedy trial. RT 411. Lambe then responded, stating he had only been appointed one month earlier and there were literally hundreds of pages of police reports he needed to review. RT 413. He stated he attempted to comply with all of Petitioner's requests. RT 413-414. Petitioner requested copies of the police reports, so he compiled them and requested copies be made for him. RT 413-414. Petitioner wanted copies of all photographs, so he arranged to have the photographs, hundreds of them, copied and provided to Petitioner. RT 414. Lambe also responded to Petitioner's complaints regarding a speedy trial. Lambe stated it would be difficult to go forward as soon as possible and put on a proper defense. RT 416. Petitioner was not being cooperative in Lambe's attempts to obtain a psychiatric evaluation, and such an evaluation was necessary to the planned defense of not guilty by reason of insanity. RT 416. Petitioner consistently refused each of his proposed experts. RT 417. In addition, Lambe stated the delays had been necessary for further investigation and evidence gathering. RT 419. Petitioner maintained at the hearing that he would continue to be uncooperative with Lambe in his search for an appropriate psychiatrist or psychologist. RT 421. The court determined Lambe was performing competently and advised Petitioner that he should cooperate with counsel. RT 424-428. The court then denied the Marsden motion. RT 428.

On February 3, 2000, a fourth Marsden hearing was held. RT 1124. Petitioner complained that James Lambe "has done nothing" on his case. RT 1124. He alleged that in the last forty days, counsel had only seen him once for ten minutes. RT 1125. He further complained that counsel had delayed his preliminary trial and was too busy to conduct Petitioner's case. RT 1125-1126. Counsel responded that he met with Petitioner six days after he was reappointed to the case. RT 1129. He met with him for approximately 45 minutes. RT 1130. Petitioner appeared very depressed and removed himself to a corner of the cubicle. RT 1130. He informed counsel that he intended to kill himself. RT 1130. He also told counsel he wanted another public defender, Roberto Dulce, to assist on the case,

and if he did not do so then Petitioner would no longer speak with counsel. RT 1130. Counsel checked with the Public Defender's Office and it was determined that Dulce would assist if the case remained a capital case. RT 1130. Thereafter, the District Attorney's Office decided not to pursue the death penalty, and so the case remained assigned to Lambe alone. RT 1131. Regarding motions, Lambe stated he would be making discovery requests. RT 1132. Lambe further stated the continuances were necessary to conduct an adequate investigation and properly prepare for trial. RT 1136-1138. The court denied the <u>Marsden</u> motion, finding counsel had done everything reasonably necessary up to that point to represent Petitioner. RT 1141.

On May 4, 2000, a fifth <u>Marsden</u> motion was held. Petitioner complained that counsel had continued to delay his trial. RT 1508. He stated he had only seen counsel once in the last thirty days even though they were scheduled to go to court ten days later. RT 1510. He further complained that defense counsel had not done any investigation on his behalf. RT 1511. Counsel responded as follows:

> MR. LAMBE: Well, I've got pages and pages of notes, but our efforts have centered on getting not guilty by reason of insanity plea entered and pursuing reports from the two appointed doctors making sure that the two appointed doctors had a complete set of records. Obtaining prior medical and psychiatric records for Mr. Coronado from his previous doctors and from the jail. Hiring a physician to review the records and photographs and determine what the cause of death was to determine whether this might have been an accidental death due to being left in the trunk of a car or whether it was caused by intentional suffocation of the deceased.
>
> We retained our own expert for psychological purposes, and that expert has spent approximately two days with Mr. Coronado administering psychological tests. Each of the last two nights I've spoken with that expert for approximately 45 minutes. Yesterday we met at the jail for several hours and - -
>
> THE COURT: And Mr. Coronado.
>
> MR. LAMBE: Yes. Mr. Coronado mentioned for the first time that he wanted interviews done with Mike French and Tom Gilbertson, so yesterday I requested my investigator to do that. I also sent follow-up requests to my investigator to complete interviews with a few other people.
>
> I talked to a court reporter yesterday regarding the completion of the previous preliminary hearing regarding Manuel Queries and assertion of attorney-client privilege by his paralegal and friend, Manuel Queries.
>
> I located the addresses for Gregory Gates and David Torres, a couple of medical practitioners that my client had seen regarding medical condition that he believed established that his wife was having an affair. I made notes to revisit the Minkler Curry's decision of attorney/client issue at the trial. I continued to have discussions and review cases regarding

the issue of manslaughter, heat of passion, and provocation and its applicability as a defense to intentional act murder and its nonapplicability to a defense of felony murder.

There's so much that has been done that it's difficult to know where to begin. Let me turn to look at the notes of our interview yesterday. We arranged yesterday to get clothes for trial for him. We discussed issue of what to do about the blood test that Judge Henry ordered but that the client refused to participate in. We discussed a possible stipulation which would avoid the necessity for the blood test.

Today we talked to the D.A. about his apparent intention not to seek blood but to simply seek a particular jury instruction based on Mr. Coronado's noncooperation. And so on.

RT 1516-1518.

Lambe further stated, "He's received a remarkable, remarkable amount of material. I don't think there is another attorney in this city who would have had the patience to take the time to so assiduously collate and photocopy and personally mail the volume of material that he has received from me . . . ." RT 1518-1519. In light of counsel's remarks, the court denied the Marsden motion, stating, "The court is confident based on the statements concerning his experience, Mr. Coronado, you have a very experienced attorney representing you." RT 1524. The court further stated, "[T]he court is impressed by the level of investigation that has taken place in your case." RT 1524.

On July 5, 2000, Petitioner brought his sixth Marsden motion. RT 1702. At the hearing on the motion, Petitioner presented a list of complaints regarding James Lambe to the court which the court then handed counsel to answer. RT 1703. He responded to each complaint. Regarding bloodwork, counsel stated neither side had analyzed the blood on the car or the deceased's clothing. RT 1704. As to witnesses, counsel stated he had subpoenaed seven even though Petitioner claimed he had subpoenaed none. RT 1704. With respect to Petitioner's complaint that counsel had many cases and was too busy to talk to him, Lambe stated he had fewer cases at that time than any other attorney in the county. RT 1704. He further stated he had made ten visits to Petitioner; Petitioner's claim that he had only visited three times was incorrect. RT 1704. As to a breakdown in communication, Lambe stated communications had been very cordial, and Petitioner had cooperated well, but for some reason, "[w]hen we arrive in court, there always seems to be a chance of a Marsden being sprung on me." RT 1705. As to witnesses and investigations, counsel stated he had complied with all of Petitioner's requests. RT 1706-1707. The court denied the motion and stated to

Petitioner, "[F]rankly, Mr. Coronado, you're quite fortunate to have an attorney who has visited you at the jail as many times as Mr. Lambe has in regards to preparing for your case." RT 1711. The court further stated, "The court is satisfied in regards to Mr. Lambe's preparation and in regards to his ability to proceed to represent you." RT 1712.

On July 14, 2000, the day trial actually began, Petitioner brought his seventh and final Marsden motion. RT 1914. Petitioner complained that Lambe had not conducted a full investigation. RT 1914. With respect to Petitioner's argument that the footprints near the vehicle had not been investigated, Lambe responded that they had, and photographs had been made and would be presented to the jury to demonstrate they were not Petitioner's. RT 1914. Counsel intended to argue this fact in Petitioner's favor. RT 1914. As to his investigation in general, counsel stated his investigator had contacted and interviewed at least eight or nine witnesses. RT 1915. Substantial investigation had been done with respect to the vehicle, the deceased's clothing, the shoes of Petitioner, and photographs of the crime scene. RT 1915. Counsel also informed the court that he had rejected several requests by Petitioner to subpoena certain character witnesses because those witnesses would open the door for the prosecution to present bad character witnesses. RT 1917. Lambe further stated that every single item of discovery had been copied to Petitioner. RT 1918. The court denied the motion, stating, "[F]rom everything I've heard here, it appears that Mr. Lambe is doing a very good job for you, sir. He's prepared. He knows the case. He's able to explain to you, hopefully satisfactorily, the questions that you raised. At least I'm satisfied that he's doing a good job for you." RT 1941.

In light of this evidence, it is abundantly clear that counsel did not fail to discuss the case with Petitioner adequately, did not fail to explain the investigation or the status of the case, and did not spend an insufficient amount of time with Petitioner. Petitioner has failed demonstrate that counsel was deficient, and his claim should be denied.

### 5.  Counsel's Deal with District Attorney

Petitioner next alleges that defense counsel entered into an agreement with the district attorney that the death penalty would be dropped if Petitioner signed over his assets.

The record reveals that such a deal never took place. The prosecutor explained that the

1   district attorney had not filed any lawsuits or offered a plea contingent on receiving certain assets.

2   RT 1907-1908. The prosecutor explained that several other lawyers were involved in representing

3   the children, and it was possible that they would be seeking the assets in a civil suit. RT 1908-1910.

4   Accordingly, the claim is completely unsupported and must be rejected.

5   　　　　　*6.  Failure to Request Instruction on Different Levels of Murder*

6   　　　　Petitioner contends defense counsel failed to request certain instructions including the lesser-

7   included offenses of murder. However, as pointed out by Respondent, defense counsel did in fact

8   request the lesser-included offenses. RT 3334-3336. Thus, the claim should be denied.

9   　　　　　*7.  Failure to Raise Issues on Appeal*

10   　　　　Petitioner also claims ineffective assistance of appellate counsel for counsel's failure to raise

11   the above claims on direct appeal. All of Petitioner's ineffective assistance of counsel claims are

12   without merit. Therefore, appellate counsel cannot be faulted for failing to raise these issues.

13   Petitioner has not shown error, or prejudice. The claim should be rejected.

14   　　　　**D.  Ground Four**

15   　　　　In his next claim for relief, Petitioner alleges he was denied his right to a speedy trial. He

16   does not develop this claim further in his petition. Respondent notes that the claim was first raised in

17   the petition for review to the California Supreme Court where it was summarily denied. See Lodged

18   Docs. Nos. 5-6. In his petition for review, Petitioner claimed his trial was delayed three times over a

19   fourteen month period despite Petitioner's protestations. He also complained that his defense counsel

20   left for three weeks to participate in the Boston Marathon "in the middle of [his] trial date." Id.

21   　　　　In a situation such as this where the state court supplies no reasoned decision, the Court

22   independently reviews the record to determine whether the state court clearly erred in its application

23   of Supreme Court law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review

24   is not de novo when the state court does not supply reasoning for its decision, but an independent

25   review of the record is required to determine whether the state court clearly erred in its application of

26   controlling federal law."); see also, e.g., Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir.2002).

27   Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir.2000). That is, although the Court independently

28   reviews the record, it still defers to the state court's ultimate decision.

1    "The Sixth Amendment guarantees that in all criminal prosecutions, the accused shall enjoy

2    the right to a speedy trial."  Doggett v. U.S., 505 U.S. 647, 651 (1992); see also United States v.

3    Beamon, 992 F.2d 1009, 1012 (9th Cir. 1993).  Although the Sixth Amendment Speedy Trial Clause

4    is broad on its face, its breadth has been qualified by case law which recognizes the relevance of four

5    separate enquiries: (1) whether delay before trial was uncommonly long, (2) whether the government

6    or the criminal defendant is more to blame for that delay, (3) whether, in due course, the defendant

7    asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result.

8    Doggett, 505 U.S. at 651; see also Barker v. Wingo, 407 U.S. 514, 530 (1972.)

9        Doggett breaks the first inquiry, length of delay, into two steps.  Doggett, 505 U.S. at 652-

10   653; Beamon, 992 F.2d at 1012.  To trigger a speedy trial inquiry, an accused must show that the

11   period between indictment and trial passes a threshold point of "presumptively prejudicial" delay.

12   Beamon, 992 F.2d at 1012.  If this threshold is not met, the court does not proceed with the Barker

13   factors.  Id.  If, however, the threshold showing is made, the court considers the extent to which the

14   delay exceeds the threshold point in light of the degree of diligence by the government and

15   acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief.  Id.

16       *1. Length of Delay*

17       On April 21, 1999, Petitioner was arraigned in the Fresno County Superior Court and entered

18   a plea of not guilty. CT[3] 12. On December 9 and 10, 1999, a preliminary hearing was conducted. CT

19   183-307. On December 13, 1999, it was ordered that Petitioner would be held to answer to the

20   charges. CT 306, 310. On July 14, 2000, jury trial commenced. CT 425; RT 1904. As noted by

21   Respondent, approximately 15 months elapsed between initial arraignment and jury trial.

22       In Doggett, the Supreme Court found that a delay, "at least as it approaches one year,"

23   "marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry."

24   505 U.S. at 652 n. 1.  Therefore, the delay of fifteen months in this case surpasses the threshold

25   point, and the Court must consider the remaining three Barker factors to determine whether

26   sufficient prejudice exists to warrant relief. Beamon, 992 F.2d at 1012.

27

28

---

[3]"CT" refers to the Clerk's Transcript on Appeal.

1        _2. Reasons for Delay_

2        The relevant chronology of events in this case leading from arraignment on April 21, 1999, to

3  trial on July 14, 2000, is thoroughly and correctly set forth by Respondent in his answer.

4  Accordingly, the Court will adopt it in full as follows:

5        April 14, 1999: Petitioner and defense counsel requested to delay arraignment one week in
        order to obtain discovery. (CT 7; RT 4.)

6
        April 21, 1999: Petitioner arraigned, pled not guilty. (CT 12.)
7
        May 4, 1999: Petitioner arraigned on first amended complaint; Petitioner pled not guilty;
8        Petitioner makes Marsden motion against attorney Weiss; Petitioner waives time to May 20,
        1999, wants jury trial as soon as possible; defense attorney moves to continue to May 18,
9        1999, for preliminary hearing. (CT 15; RT 101-104,106-107.) Marsden motion denied. (CT
        15.)
10
        May 18, 1999: Defense attorney requested continuance of preliminary hearing to June 8,
11       1999, because he wanted to obtain the autopsy report and to conduct more investigation. (CT
        21; RT 201.) Petitioner refused to waive time to June 8th, he wanted a trial as soon as
12       possible. (RT 202.) Petitioner declined the court's offer to go "forward today." (RT 202.)
        Petitioner told court he wants a "speedy trial" as soon as possible (RT 203); Petitioner moves
13       to dismiss his attorney, court replies that Petitioner had Marsden hearing at last hearing and
        denied the motion. (RT 203.) Petitioner then waived time to June 8th, plus five court days -
14       he still wants a speedy trial. (RT 205.) Preliminary hearing continued to June 8, 1999. (RT
        206.)
15
        June 8, 1999: The matter was continued to June 11th because defense counsel had been
16       assigned out for trial in another case. (RT 301.) He was in trial on a special circumstance
        homicide case that was expected to last another three weeks and possibly into July. Defense
17       attorney informs court that Petitioner's case was a death penalty case at that time, that he had
        put in a lot of preparation and that it would not be resourceful to reassign it to another
18       attorney because it would take a month for a new attorney to be prepared. (RT 302.) Defense
        attorney did not believe he would do "justice" by conducting the preliminary hearing in
19       Petitioner's case at that time because it was a serious case and he was currently in trial in
        another special circumstance homicide case. (RT 302.) Matter continued to June 11th for
20       status hearing and Marsden motion.

21       June 11, 1999: Marsden hearing conducted; attorney Weiss relieved. (CT 32; RT 301, 303.)
        New public defender to be appointed on June 14, 1999. (CT 32.)
22
        June 14, 1999: Public Defender Jim Lambe appointed. (CT 41; RT 404.) Attorney Lambe
23       requested continuance because he had not yet received approximately 1,500 pages of police
        reports, he asked for preliminary hearing to be set for July 22, 1999, noting that it is a special
24       circumstance case and possibly a death penalty case. (RT 404.) Petitioner asks for speedy
        trial, court finds good cause to continue. (RT 404, 406.)
25
        July 16,1999: Marsden motion; denied. (CT 43.)
26
        July 22,1999: Preliminary hearing continued to August 3,1999. Clerk's Transcript indicates a
27       box checked next to "WTFT" and handwritten, "general and through 9-14-99." (CT 44.)
        (Respondent did not locate Reporter's Transcript for this date.)

28

1    July 28, 1999: Attorney Barbara O'Neill files substitution of attorney in place of the Public Defender's Office. (CT 45.)

2

3    August 3,1999: Attorney O'Neill requests preliminary hearing be set for August 31, 1999, but she was not sure if she would be ready on that date. (RT 501.) The court states that "at the last hearing we took a general time waiver and a specific waiver through September 14th ...."

4    (RT 502.)

5    August 31, 1999: Attorney O'Neill previously filed a motion to continue the preliminary hearing to November 2nd because of her trial schedule in September and October. (RT 601,

6    603.) The prosecutor objected to the continuance. (RT 601-602.) Attorney O'Neill informed the court that she needed to know more about Petitioner's mental condition, and that she had

7    approximately fifty witnesses that needed to be interviewed in Santa Cruz. (RT 602-603.) Petitioner stated, "whatever Mrs. O'Neill says, that's fine with me." (RT 606.) Petitioner

8    waived time to have the preliminary hearing heard within ten court days, and sixty calendar days of the date of his arraignment. (RT 606.) Preliminary hearing continued to October 7,

9    1999. (RT 606.)

10   October 7,1999: Attorney O'Neill informed the court that Petitioner had injured himself and he was at "UMC." (RT 803.) O'Neill declared a doubt about Petitioner's competence pursuant

11   to Penal Code section 1368, subdivision (a). (RT 803.) Clerk's Transcript indicates Petitioner attempted suicide. (CT 161.) Matter continued to October 8th. (CT 161.)

12

13   October 8, 1999: Attorney O'Neill declared a doubt about Petitioner's competence pursuant to Penal Code section 1368. (RT 807-808.) Indicates Petitioner was in the hospital. (RT 808; CT 162.) Attorney O'Neill moves to continue to October 15th. (RT 808; CT 162.)

14   Proceedings suspended for determination of Petitioner's present sanity. (CT 163.)

15   October 15, 1999: Criminal proceedings suspended, two doctors appointed to evaluate Petitioner. (RT 904.) Continued to November 12, 1999. (RT 904; CT 166.)

16

17   November 12, 1999: Based on doctors reports, criminal proceedings reinstated. (CT 167; RT 1004.) Attorney O'Neill in trial in a different case, earliest available for the preliminary hearing is December 9, 1999. (RT 1004.) Petitioner waives right to a preliminary hearing

18   prior to December 9, 1999. (RT 1004.)

19   December 9 - 10, 1999: Preliminary hearing conducted. (CT 174-175, 179.) Petitioner held to answer to charges. (RT 306.) Arraignment set for December 22, 1999. (RT 307.)

20

21   December 22, 1999: Petitioner arraigned, pled not guilty. (RT 1104.) Attorney O'Neill asks the court to be relieved because neither Petitioner nor his family are able to retain her any longer. (RT 1104.) Public defender appointed. (RT 1106.) Petitioner does not waive time for

22   trial - does not want to enter plea on this date. (RT 1106.) Court enters not guilty plea for Petitioner. (RT 1107.) Petitioner refuses to talk with public defenders. (RT 1107.) Court sets

23   trial for February 7, 2000, trial conference for January 27, 2000. (RT 1107.)

24   January 27, 2000: Public Defender Lambe is trial counsel for Petitioner. Lambe indicates that he has been in trial, and he requests a trial conference on February 3, 2000. (RT 1109-1110.)

25   Petitioner states that he does not want any delays. (RT 1109.) Petitioner asks court for a Marsden hearing. (RT 1110; CT 325.)

26

27   February 3, 2000: Marsden hearing conducted; denied. (CT 335.) Attorney Lambe asked court for continuance, over Petitioner's objection, so he can be prepared for trial - if the case goes to jury trial at the next set date Petitioner would have no defense. (RT 1116-1117.)

28   Prosecutor questioned whether attorney Lambe had stated sufficient grounds to warrant a

1   continuance over Petitioner's objections. (RT 1116.) Court finds good cause to continue trial over Petitioner's objections. (RT 1120.) Jury trial set for May 15, 2000. (RT 1120.) Trial
2   conference set for May 4th. (CT 335.) Petitioner does not waive time. (RT 1116.)

3   _March 27, 2000:_ Petitioner continues plea of not guilty, adds plea of not guilty by reason of insanity. (RT 1301; CT 339.) Doctors appointed (RT 1302-1303), Petitioner does not want
4   any trial delays. (RT 1302-1303.) Set for April 3rd for status reports. (RT 1304.)

5   _April 3, 2000:_ Court checked on status of doctors; Petitioner wants no trial delays. (RT 1306; CT 340.)
6
    _April 21, 2000:_ Court grants prosecution's motion to draw Petitioner's blood for DNA testing.
7   (RT 1407; CT 369.)

8   _May 4, 2000:_ Attorney Lambe requests continuance. He retained a psychological expert who has completed a great deal of work, but he has not yet finished the final report and
9   recommendation. (RT 1501; no CT for this date.) Lambe asks court for July 10th for trial - says he learned on February 3 that the prosecution would not seek the death penalty and that
10  he would be the sole attorney on the case. (RT 1501.) Petitioner objects, wants speedy trial, will not waive time. (RT 1503.) Court finds good cause based on the necessity of obtaining
11  information from the expert witness - that defense counsel needs the information to adequately represent Petitioner. (RT 1504.) Jury trial set for July 10, 2000; trial conference
12  set for June 29, 2000. (RT 1505.) _Marsden_ motion denied (no CT for May 4th.).

13  _June 30, 2000:_ Trial conference trailed to this date. (RT 1607; CT 389.) Petitioner asks court for thirty day continuance of jury trial because he claims his attorney is not ready - he gave
14  his attorney a witness list and his attorney had not yet subpoenaed the witnesses. (RT 1608.) Attorney Lambe did not believe continuance was necessary. (RT 1608.)
15
    _July 5, 2000:_ _Marsden_ motion; denied. (RT 1701; CT 390.) Petitioner informs the court that
16  his father died two days ago, he requests that the trial be "put off a couple days." "One time waiver for that reason." (RT 1714.) Prosecutor says he does not believe there is good cause to
17  delay. (RT 1714.) Petitioner asked for "ten days at least." (RT 1715.) Petitioner waives time. (RT 1715.) Jury trial set for July 17, 2000. (RT 1715.) Courts sets matter for July 10th to hear
18  Petitioner's continuance motion. (RT 1716.) On July 10, 2000, Clerk's Transcript indicates Petitioner will not waive time, matter set for July 14, 2000. (CT 425.)
19
    _July 14, 2000:_ Petitioner asks court for 45 day continuance of jury trial. (RT 1904; CT 425.)
20  Petitioner states, "I need a general time waiver." (RT 1904.) Petitioner wants to hire a new attorney; _Marsden_ held; denied. (RT 1904, 1943.) Court denies Petitioner's motion to
21  continue jury trial. (RT 1948-1950.) Jury trial starts. (CT 426.)

22  _See_ Respondent's Answer at 21-24.

23      It is clear from the record above that the delay was not attributable to the government, and

24  there certainly was not a deliberate attempt by the government to delay the trial in order to hamper

25  the defense. _Barker_, 407 U.S. at 531. Rather, the delays were caused in substantial part by

26  Petitioner's own actions: 1) Repeated filings of _Marsden_ motions and attempts to seek different

27  counsel; 2) Various competency and mental issues; 3) Failures to cooperate with defense counsel; 4)

28  Failures to cooperate with retained psychologists and psychiatrists; and 5) Petitioner's own requests

1  for continuances. The delay was also due in part to the complexity of the case, and the necessity for

2  extensive investigation.

3       *Petitioner's Assertion of Right*

4       It is clear from the record that Petitioner made numerous requests for a speedy trial.

5  However, he also made several requests for continuances and waived his right to a speedy trial. As

6  pointed out by Respondent, on the day trial actually commenced Petitioner had attempted to obtain a

7  45-day continuance which was denied. RT 1904, 1948-50.

8       *Prejudice*

9       In <u>Barker</u>, the Supreme Court identified three interests the right to a speedy trial was designed

10  to protect. These interests include: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize

11  anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be

12  impaired." <u>Barker</u>, 407 U.S. at 532. The most serious is the third interest, "because the inability of a

13  defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or

14  disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are

15  unable to recall accurately events of the distant past." <u>Id</u>.

16       As correctly argued by Respondent, there is little evidentiary support for Petitioner's claim

17  that he was prejudiced. The main evidence was the actual tape recording of the events on the evening

18  leading up to the victim's death. Additionally, Petitioner does not point to any exculpatory evidence

19  that was lost.

20       For the reasons above, it is clear Petitioner's constitutional right to a speedy trial was not

21  violated. The delay was due in large part to Petitioner, and not at all to any action by the government.

22  Petitioner's assertion of his right was undermined by his numerous requests for continuances. And

23  finally, he has shown no prejudice resulting from the delay. Accordingly, the claim should be denied.

24       **E.  Ground Five**

25       In his final claim for relief, Petitioner alleges the trial court erred in refusing to instruct the

26  jury on the lesser-included offenses of murder. In his petition for review, Petitioner argues the trial

27  court abused its discretion by not allowing the jury to pick between varying degrees of murder such

28  as manslaughter.

1    Counsel for Petitioner requested the instructions but the trial court denied them as follows:

2    MR. LAMBE [defense counsel]: Yes. And we have a whole series of homicide lessers.

3    THE COURT: Now we're at eight.

4    MR. LAMBE: Ranging from 8.30 to 8.75, not including all of those. Well, I guess I can state
them out loud correctly. 8.30 - - these will all be eights, so I'll just say 30, 31, 32, 37, 40, 42,

5    43, 44, 45, 46, 50, 51, 70, 71, 72, 73, 74, and 75. And also 17.11. And the respective position
of the parties seems to be that the prosecution's viewpoint is that because they're relying

6    strictly on the felony murder rule for first degree murder theory that unpremeditated second
degree murder is and voluntary and involuntary, are not lessers, and the defense counters with

7    well, if the jury felt that these kinds of unlawful killings occurred but they're not satisfied that
a kidnapping occurred, they're then pushed in the direction of the finding that a kidnapping

8    with its accompanying felony murder to avoid a complete acquittal on a homicide. So that's
the basis I think on which each side is requesting and opposing these instructions.

9
THE COURT: I think it's a gutsy call on the part of the District Attorney's Office because if
10   they got it wrong, then the jury finds that there's an element missing. Intellectually, the only
thing they can do is acquit the defendant, even though they think gosh, is there anything else
11   here.

12   MR. LAMBE: I think that's asking an awful lot of the jury to do that though. And the defense
would prefer to hedge a little bit by giving the jury a third option in between complete
13   conviction and complete acquittal.

14   THE COURT: Well, I understand the request and why you'd like that, but I just don't find
any way that's possible, the way the case was filed here, you're right. So all those instructions
15   you referred to will not be given.

16   RT 3334-3336.

17        The United States Supreme Court has held that the failure to instruct on a lesser included

18   offense in a capital case is constitutional error if there was evidence to support the instruction. Beck

19   v. Alabama, 447 U.S. 625, 638 (1980).  In a noncapital case, the failure of a trial court to instruct *sua*

20   *sponte* on lesser included offenses does not present a federal constitutional question. Windham v.

21   Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995),

22   *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the

23   application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300 (1989));

24   James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*).  As this was a noncapital case, the

25   failure of the trial court to instruct on lesser included offenses does not present a federal

26   constitutional question. Windham v. Merkle, 163 F.3d at 1106.

27        Additionally, a defendant may suffer a due process violation if the jury is not given a

28   meaningful choice between conviction of a capital crime and acquittal if the evidence would support

1   a middle ground. <u>Villafuerte v. Lewis</u>, 75 F.3d 1330, 1337 (9th Cir.1996). In such a case, the jury

2   must be given the option to find a lesser included offense. <u>Beck</u>, 447 U.S. at 637 ("The failure to

3   give the jury the 'third option' of convicting of a lesser included offense would seem inevitably to

4   enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the

5   defendant's life is at stake."). As stated above, however, this was not a capital case. Moreover, the

6   jury was given a third option of convicting on a lesser included offense. The trial court instructed on

7   the lesser crime of false imprisonment, which was a lesser alternative to count I, kidnapping as basis

8   to felony murder, and count II, kidnapping. RT 3517.

9       Accordingly, as correctly argued by Respondent, there is no constitutional error upon which

10  relief may be granted. The claim should be rejected.

11                              **RECOMMENDATION**

12      Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

13  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

14  Respondent.

15      This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

16  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

17  of the Local Rules of Practice for the United States District Court, Eastern District of California.

18  Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party

19  may file written objections with the court and serve a copy on all parties.  Such a document should

20  be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

21  objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)

22  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

23  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

24  time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

25  Cir. 1991).

26  IT IS SO ORDERED.

27  **Dated:   February 1, 2008              /s/ Sandra M. Snyder**
                                            UNITED STATES MAGISTRATE JUDGE

28